JDN

**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mikhail Davitashvili, | No. CV 10-892-PHX-DGC (MEA) |
| Plaintiff, | **ORDER** |
| vs. | |
| J. Schomig, et al., | |
| Defendants. | |

Plaintiff Mikhail Davitashvili brought this civil rights action under 42 U.S.C. § 1983 against three Corrections Corporation of America (CCA) employees: Assistant Warden Chad Miller; Chaplain James Brunk; and Food Service Director Michael Hallahan (Doc. 1).[1] Before the Court are two separate Motions for Summary Judgment filed by Defendants (Docs. 36, 46) and Plaintiff's Motion to Disregard Defendants' Motions as Untimely (Doc.44). The Court will deny Plaintiff's motion, grant Defendants' motions, and terminate the action.

**I.     Background**

Plaintiff's claims arose during his confinement in the La Palma Correctional Center (LPCC) in Eloy, Arizona (Doc. 1 at 1). LPCC is a facility owned and operated by CCA (id. at 2). In Count I of his Complaint, Plaintiff alleged that he informed Brunk that he required

---

[1]Upon screening, the Court dismissed CCA, Schomig, Young, Alldredge, Powers, Roberts, Canteen Correctional Services, Croch, Meyers, and Hayman as Defendants (Doc. 8).

a kosher diet but Brunk disregarded Plaintiff's religious needs and Plaintiff was continually given non-kosher food (id. at 3).  Plaintiff further alleged that he discussed his need for a kosher diet with Miller, who also failed to ensure that he received a kosher diet.  Plaintiff claims that Hallahan repeatedly provided food that was not kosher.

In Count III, Plaintiff alleged that Hallahan denied Plaintiff proper food for Passover and refused to follow kosher laws when preparing the Passover meal (id. at 5).[2]  For relief, Plaintiff requested injunctive relief and money damages (id. at 7).

The Court found that Plaintiff's allegations sufficiently stated a claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, as well as a free-exercise claim under the First Amendment (Doc. 8).

Brunk and Miller move for summary judgment on the grounds that (1) Plaintiff failed to exhaust administrative remedies; (2) Plaintiff cannot prove a RLUIPA violation against the two Defendants; (3) Plaintiff cannot show a First Amendment violation; (4) Plaintiff did not sustain a physical injury and therefore cannot recover damages; and (5) Plaintiff is not entitled to punitive damages (Doc. 36).

Hallahan moves separately for summary judgment, arguing that (1) Plaintiff's request for declaratory and injunctive relief against Hallahan is misdirected and moot; (2) Plaintiff cannot obtain compensatory damages because he did not suffer physical injury; (3) RLUIPA does not authorize a money-damages claim against Hallahan; (4) Plaintiff's RLUIPA claim fails on the merits; (5) Plaintiff cannot show a First Amendment violation; and (6) punitive damages are not warranted (Doc. 46).

Plaintiff filed a Motion to Disregard Defendants' Motions as Untimely (Doc. 44).  He also filed a memorandum in opposition to Defendants' motions (Doc. 63).

**II.   Plaintiff's Motion to Disregard Defendants' Motions as Untimely**

The Court originally set a dispositive-motions deadline of March 25, 2011 (Doc. 23).  On Defendants' Motion for Extension of Time, the Court extended the dispositive-motions

---

[2]The Court dismissed part of Count I and Counts II and IV (Doc. 8).

deadline to April 24, 2011 (Doc. 35). Miller and Brunk filed their summary judgment motion on April 25, 2011 (Doc. 36), and Hallahan lodged his summary judgment motion that same day in conjunction with his Motion for Leave to File Excess Pages (Docs. 38-39). On May 16, 2011, the Court granted Hallahan's motion for leave and docketed his motion (Docs. 45-46).

Plaintiff moves the Court to disregard both summary-judgment motions on the ground that they are untimely (Doc. 44). Defendants oppose Plaintiff's motion and note that April 24, 2011, fell on a Sunday; thus, under Federal Rule of Civil Procedure 6(a)(1)(C), the deadline extended to April 25, 2011, and their motions were timely (Doc. 48).

Rule 6(a)(1) applies only to time periods stated in days or a longer unit, e.g., 10 days or 30 days. See Fed. R. Civ. P. 6(a)(1) ("[w]hen the period is stated in days or a longer unit of time; (A) exclude the day of the event that triggers the period; (B) count every day[.]"). The Rule does not apply when, like here, the Court sets a specific date as a deadline. Thus, Defendants' motions were filed one-day late.

But a review of the motion for an extension and the Court's Order granting the motion shows that the April 24, 2011 deadline was calculated by simply adding 30 days to the original deadline of March 25, 2011 (Docs. 34-35). Indeed, had the Court ruled that the deadline was extended 30 days without setting a hard date, then Rule 6 would apply, and April 25, 2011 would be the proper filing deadline. The Court instead mirrored the request in the motion that April 24, 2011, was 30 days later, and set that date as the deadline (id.). Obviously, neither Defendants nor the Court looked at a calendar, which would have reflected that April 24, 2011, was Easter Sunday.

The purpose underlying Rule 6 is that filing deadlines should not fall on weekend days or holidays; thus, the Court should not have set the deadline for a Sunday. More importantly, there is no prejudice to Plaintiff in accepting Defendants' one-day-late motions. The Court agrees with Defendants that by granting the motion to exceed page limits, it implicitly allowed for the motions to be filed one-day late. For these reasons, and in the

1  interests of deciding motions on the merits, the Court will deny Plaintiff's Motion to

2  Disregard Defendants' Motions as Untimely.

3  **III.   Exhaustion**

4       **A.   Arguments**

5            **1.  Brunk and Miller's Motion**

6       The Court will first address Brunk and Miller's argument that Plaintiff failed to

7  exhaust administrative remedies as required under the Prison Litigation Reform Act (PLRA),

8  42 U.S.C. § 1997e(a) (Doc. 36).  In support, Defendants submit the affidavit of Ruth

9  Williams, Grievance Coordinator at LPCC (Doc. 37, Ex. 3, Williams Aff. ¶ 1).  Williams

10 explains that the grievance procedures are set out in LPCC's Policy 14-101, which is

11 modeled on the requirements contained in Title 15 Cal. Code of Regulations § 3084 (id. ¶ 4,

12 Attach. A).  She attests that upon arrival at LPCC, inmates are issued an Inmate Orientation

13 Handbook that summarizes the grievance procedures and they are given a verbal explanation

14 of the procedures during an Orientation Program  (id. ¶ 5).  Williams states that a copy of

15 Policy 14-101 is also available to inmates in the law library (id. ¶ 6).

16      Williams describes the steps in LPCC's grievance policy: (1) an inmate must submit

17 a complaint on an Informal Resolution Form and place it in the grievance box within 15 days

18 of the alleged incident (id. ¶ 8(a)); (2) if the response to the complaint is unsatisfactory, the

19 inmate may file a Level One formal grievance within 15 days of receipt of the response (id.

20 ¶ 8(b)); if not satisfied with the response, within 15 days the inmate may submit a Level Two

21 appeal to the California Out-of-State Correctional Facility Appeals Coordinator (id. ¶ 8(c));

22 and if not satisfied with that response, within 15 days the inmate may file a Level Three

23 formal grievance to the Director (id. ¶ 8(d)).

24      Williams avers that she reviewed the facility Grievance Log and identified 11

25 informal grievances filed by Plaintiff (id. ¶ 15).  But she states that there is no record that he

26 filed any Level One formal grievances on any issue, nor is there any record that he filed any

27 Level Two or Level Three appeals (id.).

28

In addition to Williams' affidavit, Brunk and Miller rely on Plaintiff's deposition testimony to support their claim that there was no exhaustion (Doc. 36 at 8-9). They cite to Plaintiff's testimony that he filed numerous formal grievances about his kosher diet but received no responses and did not subsequently file any appeals; instead, he filed his Complaint in federal court (id., Doc. 37, Ex. 4, Pl. Dep. 105:22-25, 106:1-11, Nov. 9, 2010).

Based on this evidence, Brunk and Miller argue that Plaintiff did not exhaust and it is too late for him to remedy the exhaustion deficiencies; therefore, they move for dismissal with prejudice (Doc. 36 at 9-10).

### 2.  Plaintiff's Response[3]

Plaintiff states that he is familiar with the rules and policies governing the grievance procedures at LPCC and that he followed the steps that were available to him (Doc. 63 at 28). He avers that he filed numerous grievances related to his problems with a kosher diet (id. at 28-29).

Plaintiff states that on February 2, 2010, he submitted an Informal Resolution Form concerning diet issues he had raised in January 2010, but received no answer from the Grievance Coordinator (id. at 29).[4]

Plaintiff asserts that he filed an Informal Resolution Form on February 20, 2010, in which he complained about problems with his kosher diet and the lack of weekly Shabat services (id. at 6; Doc. 65, Ex. 9).  He avers that he received to response (id.).

Next, Plaintiff states that he submitted an Informal Resolution Form on March 7,

---

[3]The Court issued the Notice required under Rand v. Rowland, 154 F.3d 952, 962 (9th Cir. 1998), which informed Plaintiff of Federal Rule of Civil Procedure 56 and the rules governing summary judgment (Doc. 47). The Notice included language that advised Plaintiff of the evidence required to respond to Defendants' exhaustion argument (id. at 3-4).

[4]In support of this and following averments, Plaintiff cites to his separate Statement of Facts (PSOF) ¶¶ 60-61; however, those paragraphs relate to the Kosher Meal Program Guidelines at LPCC and reference pages from those Guidelines that concern preparation and special holiday meals (Doc. 64, PSOF ¶¶ 60-61, citing Doc. 41-1 at 39, 42). The Court notes that Plaintiff's Exhibit 9 includes a January 12, 2010 Request for Service seeking a meeting with the chaplain to discuss religious diet problems and a request for Jewish services (Doc. 65, Ex. 9 (Doc. 65 at 23)). See Fed. R. Civ. P. 56(c)(3).

2010, to which there was no answer, and then filed an Informal Resolution Form on March 26, 2010 (Doc. 63 at 6; Doc. 65, Ex. 11 (Doc. 65 at 42-44).  Plaintiff explains that he received an answer on May 27, 2010, and then filed a Formal Grievance immediately, which was finally answered after 60 days (Doc. 63 at 6).

According to Plaintiff, he filed another Informal Resolution Form on April 9, 2010 (id.).  Plaintiff states that he received an answer from the Manager and then filed an Inmate Formal Grievance on April 19, 2010 (id.; Doc. 64, PSOF ¶ 63, Ex. 50).  Plaintiff avers that he received no response to his Formal Grievance (Doc. 63 at 29-30).

Finally, Plaintiff states that on June 23, 2010, he filed an Informal Resolution Form to complain about kosher meals (id. at 12).  He explains that it took more than 120 days for officials to respond, and then it took another 68 days for them to respond to his subsequent Formal Grievance (id. at 12-13).  Plaintiff claims that he then timely appealed to the Warden's level but received no response (id. at 12-13).

Plaintiff contends that he made good faith attempts to follow the steps in the LPCC grievance procedures, but LPCC officials failed to respond or answer his complaints (id. at 30).  He submits that their failure to respond prevented him from filing appeals and that without responses from officials, no further administrative remedies were available to him (id., citing cases).

### 3.  Brunk and Miller Reply

Brunk and Miller respond to Plaintiff's claim that he filed an Informal Resolution on June 23, 2010 and appealed it up to the Warden's level (Doc. 69 at 4).  They note that the evidence Plaintiff cites to support this claim is actually paperwork from an October 2010 complaint, which was months after he filed this lawsuit on April 21, 2010 (id., ref. Doc. 64, PSOF ¶¶ 34-35).  Brunk and Miller assert that the records shows that Plaintiff did not appeal to the Warden's level or file any other appeals; rather, he simply filed another informal grievance (Doc. 69 at 4-5, n. 6).  Brunk and Miller conclude that Plaintiff failed to exhaust and, consequently, deprived the parties of an opportunity to address Plaintiff's concerns (id. at 5).

### B.    Legal Standard

Under the PLRA, a prisoner must exhaust available administrative remedies before bringing a federal action.  See 42 U.S.C. § 1997e(a); Griffin v. Arpaio, 557 F.3d 1117, 1119 (9th Cir. 2009).  Exhaustion is required for all suits about prison life, Porter v. Nussle, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, Booth v. Churner, 532 U.S. 731, 741 (2001).  A prisoner must complete the administrative review process in accordance with the applicable rules.  See Woodford v. Ngo, 548 U.S. 81, 92 (2006).

Exhaustion is an affirmative defense.  Jones v. Bock, 549 U.S. 199, 212 (2007).  Thus, the defendant bears the burden of raising and proving the absence of exhaustion.  Wyatt v. Terhune, 315 F.3d 1108, 1119 (9th Cir. 2003).  Because exhaustion is a matter of abatement in an unenumerated Rule 12(b) motion, a court may look beyond the pleadings to decide disputed issues of fact.  Id. at 1119-20.  Further, a court has broad discretion as to the method to be used in resolving the factual dispute.  Ritza v. Int'l Longshoremen's & Warehousemen's Union, 837 F.2d 365, 369 (9th Cir. 1988) (quotation omitted).  If a court finds that the plaintiff failed to exhaust administrative remedies, the proper remedy is dismissal without prejudice.  Wyatt, 315 F.3d at 1120.

### C.    Analysis

Brunk and Miller are correct that Plaintiff's June 23, 2010 attempt to grieve his claim about kosher diets does not satisfy the exhaustion requirement.  The record does not support that Plaintiff filed an appeal to the Warden, and even assuming that he did, because he initiated the grievance after filing this lawsuit, it does not serve to exhaust his claim (see Doc. 1 at 7 (Compl. signed and filed by Pl. on April 15, 2010)).  See Vaden v. Summerhill, 449 F.3d 1047, 1050 (9th Cir. 2006) (a prisoner must exhaust before submitting a complaint in federal court).

The grievances that Plaintiff initiated on April 9 and March 26, 2010, also fail to support proper exhaustion under Vaden because they were still proceeding through the grievance process when this lawsuit was filed.  Id.

Brunk and Miller do not respond to or refute Plaintiff's claims that he submitted Informal Resolution Forms on February 2 and 20, 2010, and received no responses (see Doc. 69). Plaintiff proffers a copy of his February 20, 2010 Informal Resolution Form (Doc. 65, Ex. 9), but the Court does not find a copy of the February 2, 2010 Informal Resolution Form in the record. As stated, Grievance Coordinator Williams confirmed that Plaintiff filed 11 informal grievances at LPCC (Doc. 37, Ex. 3, Williams Aff. ¶ 15). Copies of those 11 grievances are not submitted with Williams' affidavit (see id.). Thus, the record does not foreclose the possibility that Plaintiff filed a February 2, 2010 grievance, and Brunk and Miller fail to show that he did not. See Wyatt, 315 F.3d at 1119 (defendant bears the burden to demonstrate nonexhaustion). The Court must therefore address whether Plaintiff's February 2 and 20, 2010 Informal Resolutions, to which there was no response, constituted exhaustion of available remedies.

The Ninth Circuit has held that the PLRA's exhaustion requirement is not absolute, and certain facts may justify exceptions where remedies were effectively unavailable. Nunez v. Duncan, 591 F.3d 1217, 1223-24 (9th Cir. 2010). Numerous courts have found that administrative remedies are not available to a prisoner if officials fail to timely respond to a grievance. Boyd v. Corr. Corp. of America, 380 F.3d 989, 996 (6th Cir. 2004); Jernigan v. Stuchell, 304 F.3d 1030, 1032 (10th Cir. 2002); Lewis v. Washington, 300 F.3d 829, 833 (7th Cir. 2002); Foulk v. Charrier, 262 F.3d 687, 698 (8th Cir. 2001); Powe v. Ennis, 177 F.3d 393, 394 (5th Cir. 1998). Whether remedies remain available depends on the procedural rules governing the grievance process and if those rules provide guidance to a prisoner when there is no response to a grievance. See Jones, 549 U.S. at 200 (the procedural rules are defined by the prison grievance process, not by the PLRA); Brown v. Valoff, 422 F.3d 926, 937 (9th Cir. 2005) ("information provided the prisoner is pertinent because it informs our determination of whether relief was, as a practical matter, 'available'").

The Court has reviewed Policy 14-101 and finds no provision that informs an inmate what steps to take if he receives no response to his Informal Resolution (Doc. 37, Ex. 3, Attach. A). See Brown, 422 F.3d at 937. The policy only directs inmates how to proceed

after receiving an unsatisfactory Informal Resolution response (id., § 14-101.4 ¶¶ N(3), P(1)). The face of the grievance forms does not include any additional instructions that would advise inmates what to do in the event there is no response to the Informal Resolution (see Doc. 65, Ex. 50). In addition, there is nothing within Title 15 of the California Code of Regulations § 3084—the model for Policy 14-101—that informs an inmate how to proceed absent a response to the initial filing. 15 Cal. ADC § 3084 *et seq.*[5] Both § 3084 and Policy 14-101 require officials to respond to grievances within a specified time period. 15 CA ADC § 3084.8(c); Doc. 37, Ex. 3, Attach. A, § 14-101.4 ¶ N(2)(d) & (e), (3)(b).

By failing to respond to Plaintiff's allegations about the February 2 or 20, 2010 Informal Resolutions or to Plaintiff's legal argument that remedies are unavailable when there is no grievance response, Brunk and Miller fail to demonstrate that Plaintiff had an available remedy after he received no response to either his February 2 or 20, 2010 Informal Resolution. Accordingly, Brunk and Miller's request for dismissal for nonexhaustion will be denied. The Court therefore turns to Defendants' arguments for summary judgment.

**IV.    Summary Judgment Standard**

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Under summary judgment practice, the movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323.

If the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the

---

[5]Title 15 of the California Code of Regulations § 3084 provides that the response to the first level review must be completed within 30 days after receipt, and if there is a delay that prevents a timely response, the inmate must be provided an explanation of the reasons for the delay. 15 CA ADC § 3084.8(c) & (e).

1   dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for

2   the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 250 (1986) ; see Triton

3   Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need

4   not establish a material issue of fact conclusively in its favor, First Nat'l Bank of Ariz. v.

5   Cities Serv. Co., 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific

6   facts showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co., Ltd. v.

7   Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted); see Fed. R. Civ. P.

8   56(c)(1).

9       At summary judgment, the judge's function is not to weigh the evidence and

10   determine the truth but to determine whether there is a genuine issue for trial.  Anderson, 477

11   U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence, and draw all

12   inferences in the nonmovant's favor.  Id. at 255.

13   **V.    Facts**

14       The parties' respective statements of facts set forth the following relevant undisputed

15   and disputed facts:[6]

16       Plaintiff arrived at LPCC around December 23, 2009 (BMSOF ¶ 4: PSOF ¶ 4).  He

17   was transferred from another CCA facility, where he had been approved through the

18   Chaplaincy Department for a kosher diet (PSOF ¶ 8; Doc. 65, Ex. 3).  On December 23,

19   2009, Plaintiff submitted an Inmate Request Form indicating that he just arrived at the

20   facility and he required a kosher diet; the response informed Plaintiff to submit forms to the

21   Chaplain's office to obtain a diet card (PSOF ¶ 9; Doc. 65, Ex. 4).

22       Because he was not receiving kosher meals, Plaintiff went on a hunger strike in

23   December 2009, at which time Brunk visited with Plaintiff and advocated for him to receive

24

25   ───────────────

26       [6]See Brunk and Miller's Separate Statement of Facts (BMSOF) (Doc. 37); Hallahan's
    Separate Statement of Facts (HSOF) (Doc. 40); and Plaintiff's Separate Statement of Facts
27   (PSOF) (Doc. 64).  The Court considers only those factual assertions that are relevant to
    Plaintiff's kosher diet claims and that are properly supported.  See Fed. R. Civ. P. 56(c); Orr
28   v. Bank of America, 285 F.3d 764, 773 (9th Cir. 2002) (a district court may consider only
    admissible evidence in ruling on a motion for summary judgment).

a kosher diet (BMSOF ¶ 9; PSOF ¶ 10).

On December 28, 2009, Miller visited Plaintiff in LPCC medical unit and listened to Plaintiff's concerns about the food provided to him at LPCC (BMSOF ¶¶ 20-21).  While Plaintiff was in the medical unit for treatment related to his hunger strike, he received kosher meals that were acceptable to him (Doc. 37, Ex. 2, Attach.).  Miller spoke with the Assistant Warden in charge of Food Services and informed him of Plaintiff's need for a kosher diet (id., Ex. 2, Miller Aff. ¶ 16).

Plaintiff submitted a form requesting a Jewish Religious diet on January 20, 2010, and a restricted diet Order was issued for Plaintiff on January 22, 2010 (HSOF ¶ 21 (in part); Doc. 41, Ex. B; Doc. 37, Ex. 1, Exs. A-B).

On February 2, 2010, Plaintiff submitted an Inmate Request for an interview with Miller; Plaintiff referenced their December 29, 2009 meeting and stated that not much had changed since then and he still had problems with his religious diet (PSOF ¶ 27; Doc. 65, Ex. 22).  Plaintiff states that there was no response to this request (PSOF ¶ 27).

Pursuant to Miller's suggestion, Plaintiff was assigned a job in food services to instruct kitchen personnel in the preparation of kosher food (BMSOF ¶¶ 28-29).  Plaintiff began working in the LPCC kitchen on February 15, 2010 (PSOF ¶ 36; Doc. 65, Ex. 27).  He worked in the kitchen from February 15 to the end of March 2010, and his job entailed preparing all kosher diet meals served at LPCC, including his own (HSOF ¶ 38).  While working in the kitchen, Plaintiff states that he discovered that the canned tuna did not contain any symbols indicating that it was certified as kosher, so he notified Hallahan (PSOF ¶¶ 47, 49).  Hallahan states that the tuna was Stella brand tuna packed by Pataya Food Industries, Ltd., which is a kosher certified tuna packer; thus, the Stella canned tuna was kosher (HSOF ¶ 37).  Hallahan states that, nonetheless, to appease Plaintiff, the tuna brand was switched and in February or March 2010, the kitchen began serving Chicken of the Sea brand tuna, which is certified as kosher by the Orthodox Union and bears a kosher certification on its label (id.; Doc. 41, Ex. I).

Hallahan states that all cold cereals served to Plaintiff are kosher and bear the kosher

1    certification symbol (Doc. 41, Hallahan Aff. ¶ 26).  Plaintiff states that he has been served

2    Frosted Mini Wheats cereal, which is not kosher (PSOF ¶ 50; Doc. 65, Exs. 33-34).

3          On March 7, 2010, Plaintiff submitted a Request for Service that asked about

4    ceremonial foods for Passover (PSOF ¶¶ 14, 29; Doc. 65, Ex. 10).  There was no response

5    to this Request for Service, so on March 26 and 30, 2010, Plaintiff filed Emergency Informal

6    Resolution Forms about Passover food preparation (PSOF ¶¶ 15-16; Doc. 65, Exs. 11-12).

7          Hallahan states that about a week before Passover 2010, Plaintiff repeatedly requested

8    a copy of the Passover menu, but Hallahan told Plaintiff that he did not have authority to

9    provide a copy of the menu; rather, Plaintiff had to request it from the chaplain (HSOF ¶ 40).

10   Hallahan states that after Plaintiff obtained a copy, he claimed that it did not satisfy Passover

11   standards—even though it had been approved by a rabbi (id.).  Hallahan states that Plaintiff

12   requested changes to the menu, and when Hallahan told him he had no authority to modify

13   it, Plaintiff quit his kitchen job (id.).

14         Plaintiff states that Defendants failed to provide the essential food items for the

15   March 31, 2010 Passover meal (PSOF ¶ 52).  Hallahan states that the entrees served during

16   Passover were certified by the Orthodox Union (HSOF ¶ 43; Doc. 41, Exs. J-K).

17         On April 23, 2010, Plaintiff declared a hunger strike, and he states that in the

18   following days, while he was in the LPCC Medical Unit, he was served meals that did not

19   match the scheduled kosher menu (PSOF ¶¶ 54-55).

20         Plaintiff states that while confined at LPCC, he has lost more than 30 pounds (PSOF

21   ¶ 68).

22   **VI.    First Amendment Analysis**

23         **A.    Legal Standard**

24         The First Amendment provides that the government shall not prohibit the free exercise

25   of religion.  U.S. Const. Amend. I.  Prisoners must therefore be afforded reasonable

26   opportunities to exercise their religious freedom.  Cruz v. Beto, 405 U.S. 319, 322 n. 2

27   (1972).   Nevertheless, free-exercise rights are "necessarily limited by the fact of

28   incarceration, and may be curtailed in order to achieve legitimate correctional goals or to

maintain prison security." <u>O'Lone v. Shabazz</u>, 482 U.S. 342, 348 (1987).  With respect to the claim at issue here, the Ninth Circuit has held that inmates "have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion." <u>Ward v. Walsh</u>, 1 F.3d 873, 877 (9th Cir. 1993) (citation omitted).

To establish a First Amendment free-exercise violation, a plaintiff must first show that the religious practice at issue concerns a sincerely held belief and that the claim is rooted in religious belief.  <u>Malik v. Brown</u>, 16 F.3d 330, 333 (9th Cir. 1994) (internal citations omitted); <u>see</u> <u>Shakur v. Schriro</u>, 514 F.3d 878, 884-885 (9th Cir. 2008).

The plaintiff must then demonstrate a burden to his sincerely held belief. <u>Shakur</u>, 514 F.3d at 884.  To substantially burden the practice of an individual's religion, the interference must be more than an isolated incident or short-term occurrence. <u>See</u> <u>Canell v. Lightner</u>, 143 F.3d 1210, 1215 (9th Cir. 1998) (interference that is relatively short-term and sporadic was not substantial).

Finally, if the regulation or conduct at issue impinges on the plaintiff's constitutional rights, it is valid if it is reasonably related to legitimate penological interests.  <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987).  <u>Turner</u> sets out four factors to be balanced to determine whether a regulation is reasonable. <u>Id.</u> at 89-90.[7]

## B.    Arguments

### 1. Brunk and Miller

Brunk and Miller argue that Plaintiff cannot prove that his religious practice was burdened (Doc. 36 at 13).  They cite to numerous instances that they contend demonstrate accommodations to Plaintiff and the provision of kosher meals (<u>id.</u>, citing Doc. 1 at 3, Attach.).  These two Defendants submit that Plaintiff's complaints either relate to isolated, short term incidents or are assumptions based on the fact that he does not know how the food is prepared (Doc. 36 at 13-14).  They point to Plaintiff's deposition testimony in which he

---

[7]Defendants submit that because Plaintiff cannot demonstrate a substantial burden, there is no need to analyze the <u>Turner</u> factors (Doc. 69 at 6-7 n. 8).  As set forth herein, the Court agrees and, therefore, does not reach a <u>Turner</u> analysis.

1   admits that he has no knowledge of how the food is prepared and he further admits that when

2   he worked in the kitchen, all utensils were brand new (id., citing Doc. 37, Ex. 4, Pl. Dep.

3   83:22-25).  Defendants assert that Plaintiff's claims that, at times, there were different items

4   or a smaller quantity than that listed on a day's menu are insufficient to constitute a

5   substantial burden (Doc. 36 at 14).

6          Finally, Brunk and Miller contend that even if Plaintiff could make a prima facie free-

7   exercise claim, his claim fails because he had alternative means to maintain a kosher diet

8   through commissary purchases and food packages that he is permitted to receive from family

9   members (id.; Doc. 37, Ex. 4, Pl. Dep. 43:1-20).

10                    **2.  Hallahan**

11         Hallahan also argues that Plaintiff's free-exercise rights were not substantially

12  burdened (Doc. 46 at 18).  Hallahan maintains that Plaintiff used the available procedures to

13  request a kosher diet and that he, in fact, received a kosher diet and special Passover meals

14  (id. at 12-13).  Hallahan submits evidence that the Kosher diet menu at LPCC was reviewed

15  by a Rabbi and certified as compliant with nutritional and kosher dietary standards (Doc. 41,

16  Hallahan Aff. ¶ 11, Ex. C).  He also submits copies of the "Kosher Meal Program

17  Guidelines," which detail the preparation requirements and the restriction to serving only

18  foods certified by a recognized Orthodox Kosher standard and that bear the appropriate

19  kosher certification symbol (other than inherently kosher foods like fresh fruits and

20  vegetables) (id. ¶¶ 13-15, Ex. D).  Hallahan attests that Passover meals are prepared in the

21  same manner as other kosher diet meals but the menu is modified to include special Passover

22  items, like matzo and other food with a "Kosher for Passover" certification, and he proffers

23  copies of the Passover menus for the last two years (id. ¶ 19, Ex. E).

24         Other evidence submitted by Hallahan includes copies of the kosher certifications

25  issued by the Rabbinical Council of New England for the cereals Plaintiff receives (Doc. 41,

26  Ex. G), and copies of the kosher certification issued by the Orthodox Union for the Pataya

27  tuna that was previously served and the Chicken of the Sea tuna that is now served (id., Exs.

28

1   H-I).

2   Hallahan concedes that mistakes may occur in the institutional food service operation

3   at LPCC, but he argues that any periodic failures are the exception, not the rule (Doc. 46 at

4   17). Hallahan concludes that Plaintiff's complaints about items based solely on his belief

5   that they may not be properly prepared or his dissatisfaction with some meals is insufficient

6   to show a substantial burden (id. at 16-17).

7                          **3. Plaintiff's Response**[8]

8   Plaintiff notes that Defendants do not dispute his sincerity of beliefs or that he had an

9   established right to receive kosher diet (Doc. 63 at 34). He maintains that since his arrival

10  at LPCC, it was documented that he was Jewish and required a kosher diet (id. at 32-33).

11  Plaintiff contends that Defendants nonetheless failed to provide him with a copy of the

12  kosher menu plan and they deliberately served him food that was not kosher certified (id. at

13  33, 36).

14  Plaintiff states that problems with his kosher food tray began upon his arrival and

15  continued into January 2010 and through Passover and that Brunk and Miller were aware of

16  the problems (id. at 4, 6, 9; Doc. 64, PSOF ¶ 32). According to Plaintiff, Defendants cannot

17  show that they accommodated his request for a kosher diet (Doc. 63 at 8).

18  Plaintiff recounts that during his hunger strike in December 2009, he was in the

19  medical unit and was served an unacceptable meal in Miller's presence (id. at 9). Plaintiff

20  states that Miller ordered a new tray for him, which was acceptable (id. at 10). But Plaintiff

21  claims that Miller did nothing to ensure that future meals were properly kosher (id.).

22  In response to Defendants' evidence that kosher meals that were approved by a Rabbi

23

24      [8] Plaintiff was granted leave to exceed the allowable page limit with his response
25  (Doc. 62). Much of his 40-page response, however, relates to the alleged denial of religious
    services or religious items, nutritionally inadequate food, and LPCC officials' failure to
26  respond to grievances (see Doc. 63). Those claims were dismissed on screening (Doc. 8).
    Plaintiff also cites various provisions from the Interstate Corrections Compact and Title 15
27  of the Federal Code of Regulations § 3054 that he alleges Defendants violated (id. at 34-38).
    The Court will consider only those opposition arguments and evidence pertaining to the
28  alleged First Amendment and RLUIPA violations related to the denial of kosher meals and
    proper Passover meals (see Doc. 8).

and served to Plaintiff, Plaintiff submits copies of grievance documents that complain he is not receiving the kosher meals listed on the kosher menus (Doc. 65, Exs. 23-25).  Plaintiff asserts that he was often served food trays with both dairy and meat products, which is unacceptable (id. at 18).  He also alleges that the tuna and Frosted Mini Wheats cereal did not bear the appropriate kosher certification symbols (id. at 19-20).

Plaintiff alleges that his requests to Brunk and Hallahan for a copy of the Passover menu were denied for no reason and in violation of the their duty to supply the menu (id. at 21).  Plaintiff states that the food plates he received on March 30 and 31, 2010, were not kosher for Passover, and Hallahan refused to replace the dinner plates (id. at 22-23).  During his subsequent hunger strike in April, Plaintiff claims that he was served non-kosher and spoiled foods while in the medical unit (id. at 23).

### 4.  Defendants' Replies

Brunk and Miller acknowledge that the record shows, at most (1) a five-day delay in receipt of kosher meals after Plaintiff arrival at LPCC, (2) isolated instances of mistakes in the portions of kosher meals served to Plaintiff, (3) unknown discrepancies between the kosher menu and the food actually served, (4) Plaintiff's inability to personally verify the certified packaging of the meal served to him on March 31, 2010, and (5) Plaintiff's distrust of kitchen staff's kosher meal preparation and concern over the lack of kosher certification symbols on tuna or cereal packaging (Doc. 69 at 8).  Brunk and Miller submit that none of this, nor any other evidence or allegations presented by Plaintiff, demonstrate that his religious exercise was substantially burdened (id.).[9]

Hallahan joins Brunk and Miller's reply and also argues that Plaintiff's response memorandum is deficient because it consists primarily of conclusory allegations, is

---

[9]Brunk and Miller also argue that Plaintiff cannot show that either of them personally participated in the alleged constitutional violation (Doc. 69 at 9; see Doc. 36 at 16-17).  The Court already determined on screening that the allegations in Plaintiff's verified Complaint sufficiently linked Brunk and Miller to the alleged violations (Doc. 8 at 2, 3, 5, citing Ashcroft v. Iqbal, 129 S. Ct. 1937, 1948-49 (2009), and Rizzo v. Goode, 423 U.S. 362, 371-72, 377 (1976)).

confusing, and fails to authenticate or establish admissibility of many exhibits (Doc. 73 at 1 n. 1, 2-3).  Hallahan further argues that Plaintiff's claim for injunctive relief is moot because Plaintiff is no longer incarcerated at LPCC; thus, Hallahan is no longer involved in the provision of food service to Plaintiff (id. at 4).[10]

Hallahan contends that Plaintiff fails to present any evidence that he imposed a substantial burden on Plaintiff's religious exercise (id. at 7, 13).  Hallahan asserts that the record shows that Plaintiff received individually prepared kosher and Passover meals and that efforts were made to ensure that he received the proper meals (id. at 13).

## C.    Analysis

There is no dispute that the religious practice at issue here—the provision of a kosher diet—concerns a sincerely held belief and that Plaintiff's claim is rooted in religious belief.  See Malik, 16 F.3d at 333.  Thus, the next step in the analysis is whether Plaintiff can demonstrate a burden on his religious belief.  See Shakur, 514 F.3d at 884.

Taking as true Plaintiff's claim that he did not receive kosher meals immediately upon his December 2009 arrival at LPCC, that demonstrates nothing more than a short-term interference with his religious exercise.  He concedes that just after his arrival, after initially being served an improper meal, he was given an acceptable kosher dinner (Doc. 63 at 10).  And there is no dispute that he was officially approved for the kosher diet in January 2010 (Doc. 41, Ex. B).

Plaintiff's speculation that meals provided to him are not kosher or properly prepared, absent any evidence, is insufficient to establish a genuine issue of material fact.  This is particularly true here, where the evidence includes the "Kosher Meal Program Guidelines," which describe the procedures governing kosher meal service, including preparation of kosher meals; kosher meal packaging and certification requirements; and the delivery of

---

[10]On November 3, 2011, Plaintiff submitted a Notice of Change of Address indicating his transfer to Calipatria State Prison in California (Doc. 76).  Brunk and Miller filed a Supplement to the Motion for Summary Judgment arguing that Plaintiff's transfer renders his request for injunctive relief moot (Doc. 75).

kosher meals to inmates (Doc. 41, Ex. D).  Defendants also proffer copies of the Kosher Diet menu, and Hallahan attests that all items on the menu are reviewed by a dietician and Rabbi to confirm that they meet nutritional guidelines and Kosher dietary standard (id., Hallahan Aff. ¶ 11, Ex. C).  He also attests that only prepackaged items bearing the appropriate kosher certification symbol are served and all kosher items are stored separately from non-kosher food and in areas designated exclusively for the storage of kosher items (id. ¶¶ 13-14). Hallahan explains that utensils and other equipment used to prepare Kosher Diet meals—including a separate table used solely for kosher meals—are stored and handled separately from those used for non-kosher meals (id. ¶ 14).  He states that in response to Plaintiff's concerns, the kitchen altered its normal procedure of covering the table with cellophane and two layers of butcher paper and began to wrap an additional layer of cellophane over the butcher paper, and they purchased new utensils and equipment at Plaintiff's request (id. ¶ 16).  Hallahan avers that the Passover meals are prepared in the same manner as regular Kosher meals, but with special Passover utensils and equipment (id. ¶ 18). In addition, he states that the Passover meals bear symbols specifically indicating that they are "Kosher for Passover" certified, and he proffers copies of the Passover menus (id. ¶ 19).

In his deposition, Plaintiff indicated that the "Kosher Meal Program Guidelines" were appropriate but that not everything set out in the Guidelines was followed (Doc. 37, Ex. 4, Pl. Dep. 107:9-19).  He proffers his hand-written notes documenting the meals served to him during late December 2009 and January 2010 (Doc. 65, Exs. 5, 29).  These notes demonstrate that Plaintiff was served meals with some items that were not kosher, that cheese was occasionally served with meat on the same plate, and that other meals did not contain items that should been included with that day's menu (id.).  With Plaintiff's evidence is an attached note from the chaplain, signed January 6, 2010, which states that Plaintiff's records reflect that the religious diet rotation list does not appear to be followed (id., Ex. 5).

Plaintiff's evidence supports that there were occasional mistakes made in the delivery of his kosher meals and that there was little variety in the meals served.  But Defendants'

failure to adhere to the scheduled menus does not rise to a constitutional violation.  Nor does their failure to provide Plaintiff copies of the menus.  Further, as stated, the burden or interference must be more than a sporadic or short-term occurrence.  See Canell, 143 F.3d at 1215.  The periodic problems evidenced from Plaintiff's December 2009 and January 2010 records amount to a short-term occurrence.

With respect to Plaintiff's claims regarding the Passover meals served in March 2010, Defendants present documents showing that the meals served bore the "Kosher for Passover" certifications (Doc. 41, Exs. J-K).  Plaintiff presents no evidence to refute the certification evidence; he simply challenges whether the food was, in fact, actually kosher and whether it was properly prepared.   In his deposition, however, he admitted that when he worked in the kitchen in February-March 2010, all the items used to prepare kosher foods were brand new and he has no knowledge of what items or utensils were used prior to that time (Doc. 37, Ex. 4, Pl. Dep. 78:9-19).

As to Plaintiff's claims about non-kosher tuna and cereals, Defendants present evidence that the tuna previously served and that currently served to Plaintiff both carry the proper kosher certification.  The record also shows that the majority of cereals provided to Plaintiff are kosher.  That one variety of cereal provided by LPCC is not kosher does not constitute a burden on Plaintiff's religious practice (see Doc. 65, Ex. 34 (Doc. 65-1 at 16) (letter from Rabbinical Council of New England confirming that Mini Wheats are not certified as kosher because it contains gelatin)).

In short, the record shows that Plaintiff received meals that did not comply with kosher requirements on some occasions, primarily in December 2009 and January 2010. However, there is no evidence to show that these instances were anything more than periodic service-delivery related problems.  There is no evidence that Defendants were using non-kosher foods or that the kitchen was not adhering to the Guidelines' requirements governing preparation of kosher and Passover meals.  As a result, Plaintiff cannot show that his religious practice was substantially burdened, and Defendants are entitled to summary

1  judgment on the First Amendment claim.

2  **V.    RLUIPA Analysis**

3      **A.    Legal Standard**

4          RLUIPA provides more stringent protections than those accorded by the First

5  Amendment.  Under RLUIPA, a government may not impose a substantial burden on the

6  religious exercise of a confined person unless the government establishes that the burden

7  furthers a "compelling governmental interest" and does so by "the least restrictive means."

8  42 U.S.C. § 2000cc-1(a)(1)-(2).  RLUIPA must be "construed broadly in favor of protecting

9  an inmate's right to exercise his religious beliefs."  Warsoldier v. Woodford, 418 F.3d 989,

10  995 (9th Cir. 2005) (citing 42 U.S.C. § 2000cc-3(g)).

11         The first step under RLUIPA requires the plaintiff to show that the exercise of his

12  religion is at issue; this includes "any exercise of religion, whether or not compelled by, or

13  central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).  Next, the plaintiff

14  bears the burden of establishing prima facie that the defendant's conduct substantially

15  burdened his religious exercise.  See 42 U.S.C. § 2000cc-1.  A "substantial burden" is one

16  that imposes a "significantly great restriction or onus" upon a prisoner's exercise of religion.

17  Warsoldier, 418 F.3d at 995 (citation omitted).  If the plaintiff meets the prima facie burden,

18  then the burden shifts to the defendant to prove that the substantial burden on the inmate's

19  religious practice both furthers a compelling governmental interest and is the least restrictive

20  means of doing so.  Id.

21      **B.    Analysis**

22         Here, there is no dispute that Plaintiff satisfies the first step in the RLUIPA analysis

23  and that the exercise of his religion is at issue.  Defendants argue that he has failed to make

24  the second required showing—that his religious conduct was substantially burdened (Doc.

25  36 at 13-14; Doc. 46 at 11-17).[11]

26

27         [11]Brunk and Miller also argue that Plaintiff cannot show that either of them are liable
28  for a RLUIPA violation (Doc. 36 at 10-12), and Hallahan argues that RLUIPA does not
   authorize a claim for monetary damages against Hallahan (Doc. 46 at 9-11).

The RLUIPA substantial-burden test is the same as that used under the First Amendment.  See Warsoldier, 418 F.3d at 995-96 (citing to First Amendment cases to determine what constitutes a substantial burden under RLUIPA); see also Nelson v. Miller, 570 F.3d 868, 877 (7th Cir. 2009) (the First Amendment and RLUIPA both use the substantial-burden test); Gladson v. Iowa Dep't of Corr., 551 F.3d 825, 833 (8th Cir. 2009) (once it is determined that a substantial burden exists, the analysis under the Free Exercise Clause differs from RLUIPA).  Here, Plaintiff's RLUIPA claim is based on the same factual allegations as his First Amendment claim, and the parties' arguments over whether there exists a substantial burden are the same for both claims.  Thus, this element of the RLUIPA analysis—whether there is substantial burden to Plaintiff's religious exercise—has already been addressed, and the Court concluded that Plaintiff failed to show a substantial burden to his religious exercise.

Because Plaintiff has not established a substantial burden, the RLUIPA inquiry ends, and Defendants are entitled to summary judgment on this claim.  The Court need not address Defendants' remaining arguments.

**IT IS ORDERED:**

(1) The reference is **withdrawn** as to Brunk and Miller's Motion for Summary Judgment (Doc. 36), Hallahan's Motion for Summary Judgment (Doc. 46), and Plaintiff's Motion to Disregard Defendants' Motions as Untimely (Doc. 44).

(2) Plaintiff's Motion to Disregard Defendants' Motions as Untimely (Doc. 44) is **denied**.

(3) Brunk and Miller's Motion for Summary Judgment (Doc. 36) is **granted**.

(4) Hallahan's Motion for Summary Judgment (Doc. 46) is **granted**.

(5) The Clerk of Court must terminate this action and enter judgment accordingly.

DATED this 4th day of January, 2012.

_____
David G. Campbell
United States District Judge